## TOM STEWART v. THE STATE.

*No. 528.    Decided March 13.*

1.  **Murder of Second Degree—Charge.**—See facts stated upon which it is held, that the case as made was either murder of the second degree or a clear case of self-defense, and that the charge of the court was sufficient which correctly submitted the law of murder of the first and second degrees, and gave the defendant the benefit of a charge upon manslaughter, which latter was of doubtful propriety.

2. **Same—Fact Case—Province of the Jury.**—On a trial for murder, where the evidence presented two theories—for the State, murder of the second degree; for defendant, a clear case of self-defense, and the jury adopted the theory of the State, *Held*, the verdict and judgment would not be disturbed, as the jury were the judges of the credibility of the witnesses and the weight to be given their testimony.

APPEAL from the District Court of Fannin. Tried below before Hon. E. D. MCCLELLAN.

Appellant was indicted for murder. At the trial he was convicted of murder in the second degree, the punishment being assessed at imprisonment in the penitentiary for a term of twenty years.

This homicide occurred during the month of August, 1893. The facts which led to and caused the homicide were: Deceased, Dan Martin, and his brother Ed Martin leased a farm from one Dr. James, who testified, that he owned the farm; that there was an old lane between his farm and the Smith place, but the road through the lane had not been used for several years, because there was a high bluff at the north end, which rendered travel by that route impossible. "The Martin boys asked my permission to close up the south end of the lane, and I consented, saying I had no control of it. They closed it in the spring of 1893. I was at Martin's house the morning of the day of the killing. The end of the lane was well wired up. The same evening, Tom Stewart, the defendant, came to me and asked permission to pass through my pasture and the lane, and I told him he could not do it; there had been no public road through there since I had known the place."

Ed Martin, brother of deceased, testified, in substance: "My brother Dan Martin is dead; he was killed in August, 1893. My brother and I were at home about sundown on the evening of the killing. Little Davis and his wife were there also. We heard the rumbling of a wagon and some hallooing, coming through the pasture. We recognized the defendant, Tom Stewart, Rufe Davis, and his wife and daughter as occupants of the wagon. My brother took his gun and went to the end of the lane that we had wired up. Little Davis and I went also. When my brother got there he laid the gun down. When the wagon got to the end of the lane it was stopped. Defendant jumped out of the wagon with a shotgun in his hand, ran up to the wire gap, and began to tear it down. My brother told him he must not do that; that he could not come through there. Defendant presented his gun at my brother, and said, 'I be God damned if I don't go through here, or die.' He said he had seen the justice of the peace, who told him to go through; that he had seen Dr. James, and had permission to go through; and he began to pull down the gap, and took his gun and told my brother to 'stand back.' Dan backed off toward the field gate that was near the gap. I then picked up the gun my brother had laid down, and tried to get him to take it, but he would not. I put it down again, and again picked it up and started towards the house with it, and 't was accidentally discharged. I told Stewart it was accidental; the

gun fired almost straight up. When it fired, Stewart turned to Rufe Davis and said, 'Rufe, he shot at me. Did you see that?' Rufe Davis said, 'Yes.' I again told him the gun was accidentally discharged. My brother was still near the field gate. As I walked away I heard my brother say, 'Don't shoot me, Stewart.' He repeated it three times. Stewart then shot him. I ran to the house. Rufe Davis' wife tried to get Stewart not to shoot. Stewart tore the fence down, and came up to my house, cursing, and said if I would come out he would give me some of the same kind. Just as I was going into the house, I think he shot at me. They went off to the east through the gate in the Smith farm, toward Stewart's. After they drove off they fired several shots, and were hallooing. I went to my brother; he was dead. My brother and I picked some cotton for Stewart in the fall of 1892. He claimed we picked trashy cotton, and we were discharged. I don't think Dan got very mad about it. We did not like it. I don't think we had any feeling towards defendant. I did not. About a week before the killing, defendant came through and tore down the fence. Dan told him he must quit going through and tearing down our pasture fence, and that if he continued it he would be reported. Stewart told him if he reported him he would never report another one. Whenever he came through, Stewart was always armed with a shotgun or Winchester. Rufe Davis and Tom Stewart were the only ones who ever broke down our fence."

Ed Martin's testimony was corroborated by his wife, Mattie Martin, H. D. Gaines, and Walter Meredith.

There were other witnesses who testified on behalf of the State, showing that the road which led through the lane was not and had not been used for several years.

Mrs. Rufe Davis, a witness for the defense, said: "I saw the killing of Dan Martin by Mr. Stewart. My husband, daughter, and myself were in the wagon with Stewart, going to Stewart's home to spend the night. When we arrived at the wire fence across the lane near the house where Dan and Ed Martin lived, we saw Ed Martin, Dan Martin, and Little Davis standing at the fence. Dan Martin had a gun. Little Davis had a gun, but Ed Martin had no gun. Stewart got out of the wagon and went to the end of the wire gap. Dan Martin was standing there, and told Mr. Stewart he could not come through. I think Mr. Stewart said, 'We will have to go through; we can not turn our team in the lane.' He said it was a public road, and that the justice of the peace had told him no one had the right to stop up a public road. Mr. Stewart commenced to loosen the wires. Dan Martin went through a gate into the field about fifteen feet from defendant, and immediately raised his gun and shot at Mr. Stewart. Defendant said, 'You shot me,' and raised his gun and shot Dan Martin. He walked to the gate, and fell. I don't know where Ed Martin was. He walked off as Dan went into the field, and said, 'Dan, don't you shoot.' When Dan Martin shot at Stewart the latter raised his gun, and I got out and

went to him and said, 'Don't shoot;' but he fired before I got to him. Stewart opened the gap, and told my husband to drive through, after which he got into the wagon, and showed us where the shot from Martin's gun had gone through his vest and shirt sleeve. There was but one gun fired after we left the gap. Mr. Stewart fired the shot."

The testimony of this witness was corroborated by Miss Fannie Davis, and the defendant.

The defense introduced several witnesses for the purpose of showing that the road was a public road,˙ and had not been abandoned.

The above statement is substantially the case as developed on the trial.

The court charged the jury upon murder of the first and second degree, manslaughter, and the reasonable doubt between the degrees; also the law of self-defense in connection with actual and apparent danger, also self-defense against the reasonable appearance of danger from two or more persons acting together.

Appellant's main objection to the charge of the court is embraced in the sixth ground of his motion for a new trial, as follows: "Because the court erred in not charging that deceased had no right to obstruct a public road of the second class with fence or gate or any other obstruction, and that defendant or any other person would have the right to remove such obstruction; the evidence showing that deceased had placed an obstruction across a public road of the second class, and that deceased shot at defendant while he was removing a part of same to pass through with his wagon and team; and it was fundamental error on the part of the court in failing to give a charge on this phase of the case."

*Chas. D. Grace*, for appellant.

*Mann Trice*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—Appellant, having been convicted for murder of the second degree, and his punishment assessed at twenty years' confinement in the penitentiary, appeals. We have given the statement of facts in this case a most searching examination. This was necessary in order to correctly pass upon the charge of the court. Appellant, in his motion for new trial, objects to the charge of the court, and we are called upon to say whether there was such error in the charge as to injure the rights of appellant when the whole charge is looked to in connection with the facts of the case. We are of opinion that there is no such error in the charge. It submitted to the jury, very favorably to appellant, the law of the case. Whether the road obstructed by deceased was public or private was immaterial when the circumstances attending this homicide are considered; for conceding that the road was public, and that the deceased had no right to obstruct it, and that the defendant had a right to remove the obstruc-

tions, yet if the theory of the case for the State be true, which was supported by a number of witnesses, appellant would be guilty of nothing less than murder in the second degree. The court, however, submitted the question of manslaughter to the jury. This was of doubtful propriety. The evidence presents a case of murder in the second degree, beyond any question, or a clear case of self-defense. The jury adopted the theory of the State, and this court can not say they were wrong, because they were the judges of the credibility of the witnesses and the weight to be given to their testimony.

The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.